The next matter, No. 24-1942, Blue Radios, Inc. v. Hamilton, Brook, Smith & Reynolds, P.C. et al. At this time, would counsel for the appellant please introduce himself on the record to  Good morning, and may it please the Court, I'd like to reserve three minutes for rebuttal. My name is Carl Ciceri for the appellant, Blue Radios, Inc. In this case, HBSR was involved in a multi-year scheme to deprive Blue Radios of its intellectual property. It did so secretly, together with Kopin, to advantage Kopin's interests and disadvantage Blue Radios' interests, and it abused the trust that Blue Radios reposited in the lawyers at HBSR when Blue Radios turned over its most valuable trade secrets to those lawyers. That conduct was egregious, that conduct violated multiple of the duties that a lawyer owes to a client, and that conduct is undisputed in this case. But the district court has absolved HBSR of any responsibility for these actions. It didn't absolve, they just said they were time-barred. Well, yes, by saying that they were time-barred, I'm saying that there was no attorney-client relationship, and we think that the district court erred in both of those holdings. To start with limitations, I'd like to make three basic points about a very complicated factual record. The first is that patent applications, like we're talking about here, are not capable of causing a limitations-accruing injury. Second— You agree that December 5, 2014 was the drop-dead date? We do agree with that, yes, ma'am. So why didn't the attorney's discovery on behalf of your client, why didn't that count as the known or should-have-known point? So for Mr. Klobuchar's inquiry into the Goal 9 patent portfolio in 2014, that's what we're talking about. For one thing, his discoveries about what the portfolio contained, he made them in mid-November of 2014 before the drop-dead deadline, and he didn't have any inkling that there might have been any kind of problem with the portfolio at that time. He wasn't tasked with uncovering any kind of problems. He was just tasked with looking for a few specific names in the patent records to see the status of the Goal 9 patent portfolio. That seems like you're quibbling with words. If they can't find their patents, then aren't they put on notice that something is amiss? Well, he didn't transmit any information to anyone at the Bloomberg Radios who knew anything about the portfolio and would have known that names were missing until after the drop-dead deadline in mid-December of 2014. So at that point— So you're saying that that negates agency? No, ma'am. What I'm saying is that even if Mr. Klobuchar's knowledge is attributable to Blue Radios as his client, he doesn't have enough to—what's required is not just knowledge, but awareness. So awareness is something that a specific person must have somewhere. You can't just globally pull together everyone in a corporation and say, this person has this portion of the knowledge, this person over here has this portion of the knowledge. Someone has to pull together all of this knowledge and make specific inferences from it. That's what awareness is, and that's what differs from the concept of knowledge in the more general sense. I think, though, that there's something important that we need to remember, and I think if the Court doesn't take anything else away from this argument, I urge it to consider this, and that is, when Mr. Klobuchar received this information, he did not sit on his rights. He did not—he didn't do it—he didn't do nothing. He took that information to Blue Radios, and Blue Radios said, well, that seems strange. Let's take this information to Koppen. They rented up the chain from Koppen to HBSR. And at that point—and I don't want to get into the specific assurances that they received, but they are located in page 20 and page 60 in note 7 of our brief. But they received specific assurances that led them to believe there was nothing incorrect in the portfolio, that inventorship was correct on all of the patents. Now Massachusetts law has said numerous times that when you receive assurances from a wrongdoer that nothing is wrong, then any knowledge that you might have had is negated. Limitations can't accrue if you're investigating a problem. And during your investigation, you talk to the wrongdoer, and the wrongdoer says, you don't need to go any further, nothing's wrong. And then you do. The wrongdoer can't then say, well, you sat on your rights, and you can continue to investigate and sue us. And I think the case that I think most clearly identifies this concept, and the court should review if it hasn't read already, is the Massachusetts Eye and Ear case. It involves a very similar situation in which there was concerns raised between joint venturers that one joint venturer was sharing trade secrets belonging to the other. They sent a letter saying, we have concerns about this. And they were met with assurances that nothing is wrong. But this court, interpreting Massachusetts law, said that prevented limitations from accruing in two different ways. Number one, it prevented the mere fact that they noted a potential problem wasn't noticed. Because suspicion or concern is a pull apart from actual knowledge, what's actually required to trigger the statute of limitations in Massachusetts. And second, the assurances that they received made them believe that nothing was wrong. And what are they supposed to do at that point? I think it's more important, even in this case, because those assurances came from a lawyer, and we believe them to be our lawyer. Can you address the email, the sort of reckless email that I think was Kramer's reaction to the, I don't know how to say it, but the 090 application? That's exactly right, the 090 provisional application. I mean, it's very similar, and it prevents limitations from accruing in three different ways. That episode, he may have said, well, I've got a concern that maybe something's sort of reckless about doing this. Maybe we should ask our attorneys. That's not sitting on your rights. That's also not an actual awareness that- Is that not awareness? What's that? Is it your position that's not awareness? He's concerned something's wrong, but he's not aware? I think concern or suspicion is not an awareness that you have been harmed by your attorney's conduct. I think that's right. Again, I would turn back to the Massachusetts Eye and Ear case for that same exact thing. It's not awareness. Moreover, we're also talking not only about a patent application, but a provisional application, which is essentially a placeholder to get priority in time for a later application that you're going to file. It doesn't even matter what people you list as inventors in the provisionals, as long as you're listing the claims that you're going to later pursue in a patent application. So that's incapable of causing harm. And exactly the same thing happened here as happened with Global Charge of Injury. They didn't sit on their rights. They didn't do nothing. They didn't ignore the potential problem. They flagged it internally. They brought it to Kopin. Kopin said, let's take this to HBSR, along with assurances that any problems would be corrected. The assurances, more than anything else, make everything else, all the debate here about who acquired knowledge or whether it can be attributed to an agent. Or what did he exactly mean by reckless and did recklessness imply awareness? Makes it all academic. Because even if you acquired a limitations accruing awareness at that point, it's negated by later assurances that nothing is wrong. I'd also point the court to the SJC's opinion in the Williams case. This is the exact same thing. Could you explain, because it wasn't clear to me from your brief, exactly what happened in the other litigation that you are saying should be the correct date when the limitations period. So what happened is we sued Kopin for unpaid royalties on our contract, the contract that's in record in this case. And HBSR showed up as counsel for Kopin. We thought that's strange because Kopin was our lawyers too in filing the patent application. So we filed a motion to disqualify HBSR in that litigation and that was granted. During discovery in that litigation, and during the process of figuring out disqualification issues, we learned for the first time about the fact that HBSR and Kopin had been working together to strip us from patents that we, that patent applications that we should have been on. We just didn't have any inkling before then. And that's when we entered into the tolling agreement. Exactly at that point, and again, that shows that when we saw a problem, when we actually received knowledge and awareness of any kind of problem with our portfolio, we didn't sit on our rights. We didn't do nothing. We acted immediately. And that, I think, is very powerful evidence that whenever we're talking about anything else in this case, and we're talking about other patent applications that we did against truth as knowledge or awareness, because we didn't react. We would have reacted if we saw something. And of course, that's all to put up upon the fact that we're talking about patent applications which are inscrutable to even veteran lawyers like me. It takes a patent, a special patent license to practice and file those things because they're very, very complicated. And it's just simply impossible to say that mere receipt of those kinds of documents would have given them limitations accruing the knowledge. Excuse me, I'm sorry, my voice is very weak today. I want to talk briefly about the attorney-client relationship. You have water behind you, if you need it. Thank you. And when the court approaches this question of whether an attorney-client relationship formed between HBSR and Blue Radios, I urge the court to consider patent applications to be just like a lawsuit. Just like a lawsuit, it requires that you file things before an official tribunal by someone who is licensed to practice in front of the tribunal. That person, if they're filing on someone else's behalf, has got to be a lawyer. And that lawyer has got to have the authority of the client to make that filing. And the filing constitutes the practice of law. You would never say, I've never heard of a lawyer who said, yes, I filed that lawsuit on behalf of that litigant, but I don't represent them. I don't have an attorney-client relationship with them. The filing of a lawsuit is the quintessential attorney-client relationship. And I think you have to say the exact same thing about the filing of patent applications on behalf of HBSR, on behalf of Blue Radios. So when HBSR filed a patent application solely on behalf of Blue Radios inventors, the 177, that could have only been done if an attorney-client relationship existed. That application, as well as all the other joint applications that Blue Radios was on, evinces an attorney-client relationship as a matter of law. When you file that application, when they file the application on behalf of Blue Radios, the application itself, does it say like it does in a pleading, such and such, by their attorney? It does. It says that they're the attorney for the applicants. If you look at the applications, and there's also a regulation, that's 37 CFR 1.34, that says you, by filing the application, you represent. It's like your signature in Rule 11 Obligations on filing in federal court. By your signature on this, you are representing that you have the authority to file this application on behalf of the inventors. Thank you, counsel. At this time, would counsel for the appellees please introduce herself on the record to begin? Good morning, Your Honor. It's Carolyn Fairless. I'm here on behalf of the appellees, the law firm of Hamilton, Brooks, Smith & Reynolds, which I'll refer to as HBSR, as well as each of the individual lawyer appellees. How do you respond to that last point that counsel made, that filing of the patent application solely on behalf of Blue Radios could only have been done through an attorney-client relationship? That is incorrect factually and legally, Your Honor. It's incorrect factually because one does not actually have to be a lawyer to be a patent agent, and the regulation, the federal regulation that they cited, does not say anything differently. It just speaks to authority to represent a party. Again, you could be a non-lawyer doing that. It does not speak to attorney-client relationship. Well, it speaks to some kind of agency relationship. I'm sorry, Your Honor? It would speak to some type of agency relationship, correct? Correct. And the Sun Studs case, which is a federal circuit case, discussed that relationship. And as the federal circuit explained in Sun Studs, it is a technical relationship that allows a lawyer, who in this case is representing a company, Copin, to prosecute applications where they have to work with inventors and they have to communicate on behalf of those inventors. But again, their ultimate client is the company, not the inventor, and Sun Studs explained that very well. But even if we assume that this is just like representing a lawyer in a lawsuit, which it is not, their claim still would fail. And that's under Massachusetts law, which applies to this case. And the Massachusetts case that deals with that is the case of DeRosa v. Arter. That's a Massachusetts SJC case. In that case, there's a lawyer who is retained by an insurance company in a subrogation matter to pursue a third-party claim. And the lawyer, as the lawyer is permitted to do technically, filed the lawsuit on behalf of the injured individual. Isn't a subrogation claim totally different from patent claims? I'm making the point, Your Honor, that even representing a party in a lawsuit, filing pleadings on behalf of the party, entering interrogatories, getting information from that party entering interrogatories, was held by the court in that case not to be an attorney-client relationship that would permit the injured employee to then sue the lawyer for malpractice. And that's important because so many of the cases that Blue Radios cites are cases involving disqualification of lawyers, different standard. Compelling discovery under a common interest theory, different standard. Not cases where someone is seeking to sue a lawyer. So that brings me to the statute of limitations, which is the reason why we're here today on this appeal. Blue Radios has brought claims in this case based upon the fact that it lost ownership in patent applications. And it is seeking damages based on that. Damages it knew about in 2008 and 2009, and certainly no later than 2014. Its actual knowledge is very simple. Can I just focus in on that? Yes, Your Honor. What do you think is your best evidence that Blue Radios was aware of the injuries they allege in their suit? The best evidence comes repeatedly. One is what you've referenced, which is the sort of reckless email from December of 2008. There were two things that happened in 2008. One was that Blue Radios found out that patent applications had been filed without listing its inventors or that listed Copin inventors. And it sent the sort of reckless email as a result, which it admits on page 61 of its opening brief was a fairly obvious error. It was sufficiently obvious that Blue Radios internally sent communications amongst themselves discussing it and discussing whether they needed to notify not what they've represented. They said, our lawyers. That is not what that email sent. It said, should we send a formal letter to the lawyers, which was HBSR who had filed those particular applications. One way I was thinking about that email is, is that evidence so strong? If that's your best evidence, is that so strong that there's no issue of material fact here? And, Your Honor, that is powerful evidence. But it is one of many pieces of evidence. And even if that was our only evidence, it would be enough. And there are three cases that demonstrate that. There's the case of Lyons v. Nutt, which is an SJC case, where expressions of misgiving were enough. Where the client thought that Ropes and Gray did not know what they were doing. That was years before the client knew that ultimately that involved a stock sale that had been proposed. Years before the stock sale actually happened, where the client knew at that time that the stock sale was for less money than the stock sale they had hoped to accomplish with the assistance of Ropes and Gray. Those misgivings were enough. Same with Vinci v. Byers. The misgivings that the client had about their lawyer in that case was enough to start the statute. Similarly in RTR Technologies. But we have more evidence even than that. Were there statements after the misgivings letter from Koppen of assurance? That is incorrect, Your Honor. Two things. First of all, they did not raise below this argument about assurance. So that argument is waived. Number two, the only thing that they cite to that is actually communication from HBSR came in 2016. This was after Mr. Klobuchar, Blue Radio's patent lawyer, had engaged in a letter writing campaign with HBSR, who he referred to in his billing records as opposing counsel. And in one of the letters coming back from HBSR, they set forth Koppen's position about the inventorship allegations that Blue Radio's was making, based on what Mr. Klobuchar had learned back in November of 2014. By then, the statute of limitations had long since expired. So even if you could rely on opposing counsel refuting a demand letter you sent to, told the statute of limitations, which there's no law to support that notion, you can't revive an expired cause of action by pointing to an assurance that happened after your cause of action already became untimely. The very first argument they made about harm is also an argument they did not waive below. In their brief on summary judgment, they did not raise a standalone argument that they had no harm. The only thing they argued in a section of the brief dealing with their knowledge of harm was that a provisional application, in that case the 090, was incapable of resulting in a patent by itself, and therefore by itself could not be harm. But most of the harm that they learned about in 2008 and 2009 and 2014 were non-provisional patents, and they never, ever made the allegation or the argument below that a non-provisional patent was not harm. That is something that they have argued for the first time here. In any event, even if that argument had been raised below, it too is without merit. One of the things Mr. Klobuchar learned in 2014 was that one of those patent applications, I believe it was the 627, had actually issued as a patent. So even based on what they're arguing here before this court, they had harm then. It's also important to look back at their complaint, because the arguments that they're making need to be considered in the context of the claims that they make. And they're making claims for damages based upon the loss of ownership in patent applications. And if you look at their complaint, they're not just saying that patent applications ultimately issued as patents that caused them harm. They're saying that patent applications were abandoned that caused them harm. So they learned that too in 2014 when Mr. Klobuchar did his investigation. Under their theory, because an abandoned patent application can never result in a patent, they can sue a lawyer for damages for allowing that patent application to be abandoned, and their statute of limitations would never run. That is the argument that they're making here today, which cannot be squared with Massachusetts law. They're also arguing that patent applications were assigned to the incorrect person. And I mentioned there's a wealth of information about knowledge of harm. They learned in 2008 and 2009 that fact. How could one get knowledge that a patent had been abandoned? By going to the U.S. Patent and Trademark Office website, which is exactly what Mr. Klobuchar did. These were all publicly available patent applications. There is a mechanism to ask for secrecy. That mechanism was never utilized here. So Mr. Klobuchar was able to and did go to the U.S. Patent and Trademark Office website to pull down all of the information that ultimately went into the memo that he had prepared here. I also want to talk about the case that they cited, Massachusetts Eye and Ear. I find that interesting that they cite that as one of their best cases, because that was a case that did not involve claims for damages under Massachusetts tort law against lawyers. It involved a motion to compel discovery. If you look at the Massachusetts cases that have actually been cited that deal with legal malpractice cases, there is a large number of them that have granted summary judgment, affirmed summary judgment, even affirmed judgment on the pleadings, where, as a matter of law, the court concluded that the claims were untimely. And that is exactly what we have here. They do also argue here today that Blue Radios did not have knowledge until three years after Mr. Klobuchar did his investigation. Can I just take a step back and just ask you generally, how would you describe the relationship between HBSR and Blue Radios throughout this time period? What is your position as to what that relationship was? It was a very limited relationship relating to gathering information from them and then using that information to complete and file patent applications that COPIN had instructed HBSR to file. It is highly disputed as to whether there's any liability in this case. That, of course, is not why we're here today. But we put in front of the trial court as part of our summary judgment briefing all of the evidence showing how infrequent the communications were, because one of the things that Blue Radios, of course, had to prove under the DeVoe test, which it conceded at the summary judgment hearing, was the applicable standard. They had to prove that there was a concrete request for individualized legal services or advice. And we pointed to the fact that in over 100,000 pieces of emails that were exchanged during discovery, when you call out the ones where Blue Radios was copied on a communication involving COPIN and HBSR, where there was a three-way communication, and you just whittle down the communications between Blue Radios and HBSR, there were eight documents saying things like, thank you. That was the relationship. It was an information-gathering relationship. So didn't the Colorado court come to a different conclusion? I mean, otherwise it would have allowed the representation to continue, correct? It came to a different conclusion, Your Honor, in the context of a motion to disqualify that was filed at the very beginning of the Colorado case, which was the very first time that you will find anything in the record where Blue Radios ever said that it believed HBSR was its lawyers as opposed to COPIN's lawyers, which is how it had repeatedly characterized it. But the Colorado court, and Blue Radios rightly admits that that is not preclusive in this case because the Colorado court did not have the benefit of discovery, including Mr. Klobuchar's documents, which we had to move to compel in the District of Massachusetts. It did not have the internal email saying that this was sort of reckless because we had not been able to do discovery to get that information. And, of course, the standard for a motion to disqualify is very different. You don't have to even show that there's been a conflict of interest. It can simply be based on an appearance that a court will grant a motion to disqualify. And, of course, the court in that case was not applying Massachusetts law, which everybody conceded below is the correct standard here, and that is the DeVoe test in Massachusetts, which has been the law of the state for going on 43 years now. So that order was not something that would preclude an argument here, and it's certainly not something that we think is even persuasive here, Your Honor. At the time they entered into this contract, was there any discussion whatsoever about each side needing separate attorneys? To my knowledge, not. And the reason why is because in the contract itself, Blue Radios gives away any right it has to file its own patent applications. And one of the things that it testified to in the lawsuit was that it was more interested in trade secret protection, not patent protection, and so it's not interested in pursuing its own patents. An interesting fact, however, is that Mr. Klobuchar later filed patents on behalf of Blue Radios. He did it using that secrecy mechanism, and he filed those patents naming Kopin inventors as some of the inventors and naming Kopin as a co-assignee on some of these applications, all without Kopin's knowledge, and he testified at his deposition, and Blue Radios has never taken the contrary position, that that did not make him Kopin's lawyer. So when their lawyer does something, they say one thing, and when Kopin's lawyer does something, they say something else. And here we are, Your Honor. Just to back up, so in answer to my question, your position is if there was any relationship at all between HSBS and Blue Radios, it was an information-gathering relationship where there was very little communication. That's correct. It never rose to the level of attorney-client relationship. That is correct, Your Honor. And that's clear under the DeVos test. There are two ways in Massachusetts to have an attorney-client relationship. Is that a normal relationship that law firms have with many people? It is something that is typical in doing patent prosecution, that you will file something on behalf of an inventor, and the form that is filled out may say an agent or attorney, but you're doing it as a technical way of getting the patent filed on behalf of your true client, who is the company who has retained you. And the Sunstud's case explains this. So my understanding is that it is very typical in the patent world to do this. And, Your Honor? Just finish what you're saying. Yes. And I would also add that there's also a very simple way if you wish to have a lawyer represent you to do that, and that's through an express attorney-client relationship, which everybody agrees never existed here. So, Your Honor, statute of limitations exists for a reason, which is to prevent people from having to defend against stale claims and the unfairness of that, and also from having litigation hang over their head for indeterminate amounts of time. Counselor, it's still not clear to me what HBSR thought its relationship was to Blue Radios when it filed Patent 177 application. What did you think you were doing if you weren't representing them? So that application, and there's no information in the record to contradict this, so I do think it's undisputed, that that was not requested by Blue Radios. It was requested by COBIN. And the 177 was a provisional application, which they were going to then use as a jumping stone, a stepping stone, to file other applications on behalf of COBIN inventors and on behalf of COBIN, which they did. So it was a building block, if you will, for the work that they were doing on behalf of COBIN. That was not done at the request of Blue Radios. But wouldn't you still have been representing that you were authorized on behalf of Blue to do this? Well, to be precise, the representation was that they were authorized on behalf of the inventors, the individuals, not on behalf of whoever. Blue Radios does not appear on there, not on behalf of Blue Radios. They have conflated that to try to argue that this was a representation that HBSR was representing Blue Radios. But HBSR and Blue Radios had a contractual relationship, and that contractual relationship ceded to COBIN all of the rights to prosecute any patents or no patents at all. And they retained HBSR to represent their interests, which HBSR did. They necessarily needed to speak with people who were part of this contractual relationship to make that happen, which they did, but not in a way that would make them an implied attorney for those individuals or for that company that would then allow that company to then bring a suit against them, and certainly not a suit years after the fact. We are now sitting here 17 years after this work was done and after Blue Radios sent its email, saying it was sort of reckless, after it had its knowledge. And this court should affirm the grant of summary judgment, finding that the claims are time-barred as a result. Thank you. Thank you, Your Honors. Three-minute rebuttal. Please reintroduce yourself back on the record to begin. Carl Ciceri for the Appellant Blue Radios. I want to get through a lot of things really quickly, so I'm going to rapid-fire a little bit. When you look at the contract, you're not going to see just right. You're going to see right and responsibility. So it had the right to seek patent protection, but it also had the responsibility to do so, to protect all of the intellectual property brought into the GoldenEye project and developed during it. And Blue Radios was in ownership of that technology. So even looking at the contract suggests they didn't have unfettered discretion. Now, counsel has tried to distinguish a bunch of different cases by saying those involved different kinds of proceedings, disqualifications or motions to compel documents. But if an attorney-client relationship exists, it needs to exist in every single context. You can't say, well, I'm your attorney when it comes to discovery of documents or when it comes to disqualification, but not when it comes to an actual malpractice claim. If you're an attorney, you're an attorney for all purposes, and disqualification and the attorney-client relationship stem out of that same relationship. Your Honor, Justice Thompson, I believe you're exactly right. You're talking about an agency relationship, and when the agency relationship necessarily gets into legal expertise, that agency relationship becomes the attorney-client relationship. There's just no way to carve it up and describe it any other way. And I think the Sunstud's case, by the way, really helps us, and it does not help them. Because Sunstud says, involved an inventor, that he was listed on the patent, but he had assigned his rights to his company, to his employer. And so that made the employer the proper client and not the employee. That is exactly what happened here. The inventors, the individual inventors on these patent applications were Blue Radios employees. They had assigned their rights to their employer, and that made Blue Radios the beneficial owner of the patent application invention. Now, they try and get around Massachusetts eye and ear by citing cases like Byers and Lyons, and I would suggest to you, and I think, Judge Maldacavo, I think this would address your concern. When you're talking about the sort of reckless comment, compare that to the statements in Lyons and Byers. We had no confidence. We knew at that point our lawyers didn't know what they were doing. Those are not equivocal statements. Those are absolutely clear. The question of how you would interpret sort of reckless in the entire context of that entire affair, it's just suffused with fact issues that need to be decided by a fact finder. It can't be resolved on summary judgment. Oh, and I want to end on one last point. They talk about infrequent communications. We have a 25-page chart of communications directly between Blue Radios and HBSR asking for legal advice or assistance. They said infrequent, and I think maybe eight communications. By the way, I just want to give you the record site for that, A8434, just so we don't overlook it, and I'm sorry. Well, that's what I wanted. Yeah. You have a record site for a chart that details more frequent communications? Well, I mean, it wasn't necessarily frequent. I mean, there were a lot of communications. This is only some of them, but it's 25 pages of requests for legal advice and assistance directly, and I'd urge the Court to remember Copen had asked that things be routed through them. It asked to serve as our agent in dealing with HBSR. They said route communications through us. It's all open kimono. We all want to know what we all are doing, and we want to funnel things so that we're not getting overbilled by our lawyers. But that doesn't mean that that arrangement should deprive us of the right to the attorney-client relationship. Thank you. Thank you. That concludes argument in this case.